IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

JAMES B. RINEHART,

               Plaintiff,

    Vs.                               No.  10-2209-SAC

SAINT LUKE'S SOUTH HOSPITAL,
INC. d/b/a/, SAINT LUKE'S HEALTH
SYSTEM, and SAINT LUKE'S
HEALTH SYSTEM, INC.,

               Defendants.

MEMORANDUM AND ORDER

       The case comes before the court on the parties' cross-motions for summary judgment:  the plaintiff, James B. Rinehart ("Rinehart") moves for summary judgment on his claim for tortious interference with contract (DK. 32), and the defendants, Saint Luke's South Hospital, Inc. and Saint Luke's Health System, Inc. (collectively referred to as "St. Luke's") move for summary judgment on all of the plaintiff's remaining claims:  Kansas Consumer Protection Act ("KCPA") violation, tortious interference with a contract, and injunctive relief (Dk. 33).  Both motions are fully briefed and ripe for decision.

       The plaintiff has filed a class action petition on behalf of all individuals who received any healthcare treatment from any entity located in Kansas that is owned or affiliated with St. Luke's and "whose health

insurance claim resulting from treatment was not submitted to their health insurance carrier for potential payment." (Dk. 1, ¶ 30).  It is alleged that the defendants filed hospital liens pursuant to the statutes of Kansas and Missouri instead of submitting health insurance claims and that the plaintiff suffered financial hardship because his health insurance company did not pay the bills.  The plaintiff claims the defendants' billing practices violate the Kansas Consumer Protection Act ("KCPA"), K.S.A. 50-623, *et seq.*, and tortiously interfered with the plaintiff's contract with his health insurance carrier.  The plaintiff also seeks injunctive relief on his claims.

**SUMMARY JUDGMENT STANDARDS**

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one which would affect the outcome of the claim or defense under the governing law.  *Id*.  If the movant would not have the burden of proof at trial on the particular claim or defense, then the motion must point to the absence of a genuine issue of material fact.  Instead of disproving a claim or defense, the movant

2

need only show "a lack of evidence" on an essential element.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  To counter a "properly made" motion, the non-movant must come forward with specific facts based on admissible evidence.  *Id.*  The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise."  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004).  "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*,  477 U.S. at  248.

In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Anderson*, 477 U.S. at 255.  Facts and reasonable inferences therefrom are to be viewed in the light most favorable to the nonmoving party.  *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir.2005).  At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . "  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.  *See Pinkerton v.*

3

*Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir.2009).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dk. 33)**

Injured in a car accident, Rinehart was taken to the emergency room at St. Luke's South Hospital on December 2, 2005.  He received treatment both in the emergency room and on an outpatient basis through July 14, 2006.  St. Luke's established the following four patient accounts for Rinehart's different visits for care and treatment:

Account 1:  December 2, 2005 visit      Total Charges: $2,563.65
Account 2:  December 9, 2005 visit      Total Charges: $   544.15
Account 3:  May 26, 2006 visit          Total Charges: $5,126.00
Account 4:  June & July 2006 visits     Total Charges: $3,784.00

When he was initially admitted to St. Luke's in December of 2005, Rinehart signed a consent and agreement that assigned to St. Luke's his interest and right to benefits under his health insurance, and it further affirmed that he understood "that the acceptance of insurance assignments does not relieve me from any responsibility concerning payment for said services and that I am financially responsible to the entity and physicians for the charges not covered by the policy of the insurance or self-insured plan." (Dk. 34, Att. A, Ex. 2).  By a check issued December 15, 2005, Rinehart's automobile insurer paid St. Luke's for Rinehart's charges on Account 1 under his Personal Injury Protection and Medpay benefits.

On or about December 15, 2005, Rinehart received St. Luke's billing for services provided on December 9, 2005, ("Account 2"), and it was

4

accompanied by a letter identifying Rinehart's health insurance carrier and indicating that St. Luke's would be seeking payment first from the carrier. The plaintiff's complaint cites this letter as support for his allegation that "St. Luke's initially informed Plaintiff that his medical bills would be submitted to his health insurance carrier for payment, but then refused to do so." (Dk. 1, ¶ 25). According to St. Luke's patient account system, Rinehart was sent on or about January 5, 2006, an updated final bill as to his charges for Account 2. This bill would have indicated that St. Luke's no longer planned to bill Rinehart's health insurance carrier but intended to bill his automobile insurer. Rinehart's automobile insurer paid off Account 2 by a check issued January 20, 2006.

On or about August 8, 2006, St. Luke's sent Rinehart a copy of a lien notice for $3,724 for the charges for his outpatient visits in June and July of 2006 ("Account 4"). The lien notice identifies a lien for services furnished to Rinehart in the care of injuries happening in December of 2005 "for which injuries Samuel A. Mason is alleged to be liable." The notice was addressed to Mason's automobile insurance carrier. The notice does not identify any property of Rinehart or assert any encumbrance upon the same. Rinehart testified that upon receiving the lien notice he was displeased with St. Luke's for seeking payment in this way for the medical services. By check dated March 2, 2007, Rinehart's automobile insurer paid $1,948.20 of

the total charges of Account 4.

On or around February 18, 2007, the plaintiff received a copy of another St. Luke's hospital lien notice that stated again it was for services furnished to Rinehart for the care of injuries occurring in December of 2005 "for which injuries Samuel A. Mason is alleged to be liable." The notice was addressed to Mason's automobile insurance carrier. The lien was in the amount of Account 3.

Rinehart received a letter dated October 11, 2007, from Venture Financial Services that identified itself as a debt collector for the creditor St. Luke's. The letter referenced the balances owing for Rinehart's Accounts 3 and 4 and stated in relevant part:

> This account has been placed in our office to assist in resolving the balance shown above. We show that a third party may be liable to you for your injuries and we are evaluating that information. However, you are ultimately responsible to the creditor so please review this notice.
> This communication is from a debt collector. This is an attempt to collect a debt. . . .

(Dk. 34, Rinehart Dep. Ex. 12). In his deposition, the plaintiff testified to the following about his impression from receiving this letter:

> Q. Right. And that's what I'm trying to get an understanding of is at what point does a light bulb go off in your head and you say they're not going to submit these claims to my health insurance?
> A. Yeah.
> Q. They're going to be seeking payment from some other source?
> A. I suppose the real light bulb went off whenever I got the collection agency notice. That was like--and it specifically says we're coming after you. So that's probably, as I remember it, when it really hit me

6

that it doesn't seem like these liens are going away, and what happened to my health insurance.

Q.  And that was in October of 2007?  Handing you what has been marked as Exhibit 12.  Exhibit 12 is a one-page document that is Bates labeled 13, and it's at the top right hand it says Venture Financial Services, Inc.  Do you recognize this document?

A.  It looks consistent with the document that I received.  I can't say it's the exact one, but it looks like it is to me.

Q.  And is that the document that raised concern that maybe your health insurance was not going to be paying your bills?

A.  As I recall, this is when it really started to sink in that Saint Luke's is coming after me personally for this and not filing with my health insurance as I had expected.  That's when it kind of started sinking in.

     Before the liens were like, okay, why are they doing this, and they had already said they were going to file with my health insurance. So maybe it's a matter of time.

Q.  Do you think Exhibit 12, this communication from Venture Financial Services, was a bill to you?

A.  It's much more than that.  It's we're going to take you to Court if you don't pay this.  We're going to impact your credit scores.  It's hard core.  It says this is when you get serious about I've been referred to a collection agency and they're coming after me personally, so yes, I did.

(Dk. 34, Att. A, Rinehart Dep. pp. 38-40).  As of October of 2007, "it really started to sink in" to the plaintiff Rinehart that Saint Luke's would not be filing these claims with his health insurance carrier.

     At some point in 2006, the plaintiff hired an attorney and filed a lawsuit against Samuel Mason, the third-party driver.  The plaintiff settled this lawsuit for Mason's policy limits.  In October and November of 2009, the plaintiff's attorney negotiated with Venture Financial Services over the validity and value of the liens.  While the lien notices were for more than $8,800, Venture Financial Services accepted $3,500 in November of 2009 from the plaintiff and released the liens.  The plaintiff Rinehart filed his

complaint in this court on April, 19, 2010.  (Dk. 1).

KCPA

Count one alleges a violation of the KCPA on two theories: a violation of K.S.A. 50-626(b)(2) in willfully using a falsehood or misrepresentation of the material fact that his hospital bills would be submitted to his health insurance carrier, and a violation of K.S.A. 50-626(b)(3) in willfully failing to disclose the material fact that the defendants intended to pursue a hospital lien rather than submit a claim to the plaintiff's health insurance carrier.  Because this count pleads "[a]n action upon a liability created by a statute," it is subject to the three-year statute of limitations in K.S.A. 60-512(2).  *See Thomas v. Sifers*, 535 F. Supp. 2d 1200, 1209 (D. Kan. 2007); *Williamson v. Amrani*, 283 Kan. 227, 242, 152 P.3d 60 (2007), *superseded by statute on other grounds*, *Kelly v. VinZant*, 287 Kan. 509, 520–21, 197 P.3d 803 (2008).  "The KCPA has a 3–year statute of limitations, which starts running with the occurrence of the alleged conduct constituting the violation, not the discovery of the violations.  *See Campbell v. Hubbard*, 41 Kan.App.2d 1, 7–8, 201 P.3d 702, *rev. denied*, 286 Kan. 1176 (2008); K.S.A. 60–512."  *Louisburg Bldg. & Development Co., L.L.C. v. Albright*, 45 Kan.App.2d 618, 629, 252 P.3d 597, 607 (Kan. App. 2011).  The *Campbell* decision establishes the rule that the limitations period for a KCPA claim commences with the violation and is not delayed until damages are

8

assessed:

> In a negligence claim, there is no claim until the plaintiff has been damaged; thus, the time limit to bring suit does not begin to run until the damage occurs.  As we will see, the situation differs for KCPA claims.
>     In Campbell's case, he alleged that his attorneys were negligent in representing him in a lawsuit regarding employment matters, but he wasn't damaged until that separate lawsuit was lost.  Thus, the district court concluded that this time limit for bringing the malpractice claim did not begin to run until he lost that lawsuit, which took place on June 4, 2003.  But a consumer is not required to provide damages to have a claim under the KCPA.  *See* K.S.A. 50-626(b); *Ray v. Ponca/Universal Holdings, Inc.*, 22 Kan. App. 2d 47, 49-50, 913 P.2d 209 (1995).  Thus, the time limit for bringing a claim under the KCPA begins when the KCPA violation occurs.  There is no additional period provided to discover the claim or to assess the damages before the limitations period begins to run.  *See, e.g., Four Seasons Apts. v. AAA Glass Service, Inc.*, 37 Kan. App. 2d 248, syl. ¶¶ 2,5, 152 P.3d 101 (2007).

41 Kan. App. 2d at 7-8.

The defendant contends that the plaintiff's claim for misrepresentation under KCPA accrued with St. Luke's letter dated December 15, 2005, that informed Rinehart of St. Luke's plans to make a claim against his health insurance.  As for plaintiff's KCPA claim for omission, the defendant argues it accrued no later than October 2006 when the defendant's ninety-day deadline (from the last day of treatment) for submitting the plaintiff's claims expired under the participation agreement with the plaintiff's insurance carrier.  "Thus, after October 12, 2006, Defendants could no longer have taken the action that Plaintiff asserts they should have taken--submitting Plaintiff's claim to United Healthcare."  (Dk. 34, p. 15).  Though

the discovery rule is inapplicable, the defendants contend the plaintiff received notices of the hospital's liens in August of 2006 and February of 2007, both more than three years before he filed his complaint here in April of 2010.

Because the rule from *Campbell* depends on a KCPA plaintiff not having to provide damages for an action, the plaintiff argues *Campbell* is inapplicable as he is bringing a class action and the consumer bringing a class action must "suffer[] loss as a result of a violation of [the KCPA]." K.S.A. 50-634(d). The plaintiff argues *Campbell* is distinguishable in that he continued within the limitations to make requests of St. Luke's to have his bills submitted to his insurance carrier and St. Luke's refused his requests. The plaintiff characterizes this as continuing deceptive conduct on St. Luke's part. The plaintiff insists he was not truly deceived until St. Luke's representations proved to be false, as St. Luke's could have released their liens and not sought reimbursement from his settlement recovery in November of 2009. Alternatively, the plaintiff points to his deposition testimony that it was October of 2007, within the three-year period, when he realized St. Luke's would be relying on the hospital liens and would not be submitting claims with his health insurance. Finally, the plaintiff maintains that loss is an element of his KCPA action, that the KCPA limitations period did not commence until the plaintiff could satisfy all elements, and that he first

10

suffered "loss" on November 23, 2009, when his settlement proceeds were used to satisfy the defendant's liens.

The defendant replies that the KCPA does not create a separate class-based KCPA claim but only imposes an additional requirement for an individual representing a class.  The defendant points out that a class has not been certified and that the plaintiff has only his individual claim at this point. The defendant construes the plaintiff's position as illogically seeking to toll or extend the limitations period by alleging his claim is part of a potential class. As for the balance of the plaintiff's arguments, the defendant sees them as advocating a discovery rule already rejected by the Kansas appellate courts.

The Kansas Court of Appeals in *Campbell* certainly holds that "a consumer is not required to provide damages to have a claim under the KCPA."  41 Kan. App. 2d at 7.  The court cited as authority for this proposition both K.S.A. 50-626(b) and the earlier decision of *Ray v. Ponca/Universal Holdings, Inc.*, 22 Kan. App. 2d 47, 49-50, 913 P.2d 209 (1995).  The cited statute establishes the general prohibition against deceptive acts and practices and then provides a listing of described acts and practices coming within this prohibition.  K.S.A. 50-626.  The decision in *Ray* rejected a clear and convincing evidence standard for KCPA actions and quoted the following from a law review note on the more liberal scope of a KCPA action:

"In determining the elements of proof required in a damage suit under the CPA proof of the 'deceptive trade practice' proscribed by the Act does not require proof of all the elements of a common law fraud. The word 'fraud' does not appear in the CPA; the Act does not mention any elements of common law such as scienter, reasonable reliance, material fact and resulting damage, except within a few of the listed per se violations. Further, the CPA's forerunners, Kansas misrepresentation case law and the BPA, did not require the plaintiff to prove all elements of common law fraud. Consumers cannot reasonably be expected to bear a heavier burden of proof under an Act intended by the legislature to further advance Kansas consumer interests, than that required by its predecessors." 14 Washburn L.J. at 635.

22 Kan. App. 2d at 50 (quoting Note, "A New Kansas Approach to an Old Fraud," 14 Washburn L.J. 623 (1975)).

With regards to this issue, the plaintiff's citation of K.S.A. 50-634 is well taken.  The general rule in Kansas is that "[a] cause of action accrues when the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement."  *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 410, 582 P.2d 244, 248 (Kan. 1978) (citations omitted); *Four Seasons Apartments, Ltd. v. AAA Glass Service, Inc.*, 37 Kan.App.2d 248, 253, 152 P.3d 101, 106 (2007).  It is K.S.A. 50-634 that defines when a consumer may bring a private cause of action for a violation of the KCPA:

(a)  Whether a consumer seeks or is entitled to damages or otherwise has an adequate remedy at law or in equity, a consumer aggrieved by an alleged violation of this act may bring an action to:
(1)  Obtain a declaratory judgment that an act or practice violates this act; or
(2)  enjoin or obtain a restraining order against a supplier who has violated, is violating or is likely to violate this act.
(b)  A consumer who is aggrieved by a violation of this act may recover, but not in a class action, damages or a civil penalty as

12

provided in subsection (a) of K.S.A. 50-636 and amendments thereto, whichever is greater.

(c)  Whether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief, except damages, against an act or practice that violates this act.

(d)  A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice:  . . . .

K.S.A. 50-634.[1]  By the express terms of K.S.A. 50-634(a) and (b), a consumer may bring an action for individual relief (declaratory, injunctive, damages, or penalty) only if the consumer has been "aggrieved by" a violation of the Act.  The *Campbell* decision did not cite or discuss K.S.A. 50-634 in determining when an individual claim for relief accrued under the KCPA.  The court finds nothing in *Campbell* as to indicate why this statute would not be relevant in deciding when a consumer would have the private right to institute and maintain a suit under the KCPA.

Since *Campbell*, the Kansas Court of Appeals has considered this K.S.A. 50-634 in a hospital lien context:

The Kansas Attorney General has the responsibility to enforce the KCPA and bring actions against those that violate the Act.  K.S.A. 50-628(a); K.S.A. 50-632(a), (b).  But for a consumer to have a private remedy under the KCPA, the violation must have "aggrieved " the consumer, *i.e.*, the deceptive acts adversely affected the consumer's legal rights.  K.S.A. 50-634(a), (b); *Finstad v. Washburn University*,

_____

[1]The 1973 Kansas Comment provides, in part:  "Subsection (a) permits a consumer to obtain appropriate declaratory and injunctive relief regardless of whether he recovers or has standing to recover damages. . . .  Under subsection (b), an aggrieved consumer may recover the greater of his actual damages or the civil penalties as set forth in section 50-636(a); . . . ."

252 Kan. 465, Syl. ¶ 3, 845 P.2d 685 (1993); Black's Law Dictionary 77 (9th ed. 2009).  Here, since Via Christi was not seeking judgment against Reed personally on the bill amounts, Reed's legal rights--monetary or otherwise--were not adversely affected.  Via Christi attempted to enforce a valid lien, and that enforcement, which Via Christi was entitled to pursue, did not aggrieve Reed.

*Via Christi Regional Med. Center, Inc. v. Reed*, 45 Kan. App. 2d 356, 367, 247 P.3d 1064 (2011).  As interpreted here in *Reed*, a consumer cannot successfully prosecute any private remedy action under the KCPA unless the violation has "aggrieved" the consumer.  Another panel of the Kansas Court of Appeals has interpreted this provision similarly:

Because there is a violation of the KCPA, we must decide whether Schneider is an aggrieved consumer under the KCPA. Generally, a consumer may not bring a private action under the KCPA unless the consumer can prove that the seller has aggrieved the consumer. K.S.A. 50–634.  To be aggrieved under the statute, the consumer must prove that the seller's act has adversely affected the consumer's legal rights.  *Finstad v. Washburn University*, 252 Kan. 465, 468–69, 474, 845 P.2d 685 (1993).  Additionally, the consumer must show that there was a causal connection between the deceptive act and the claimed injury. 252 Kan. at 470, 845 P.2d 685.

*Schneider v. Liberty Asset Management*, --- Kan. App. 2d ---, 251 P.3d 666, 671 (2011).

The Kansas Supreme Court in *Finstad* arrived at a meaning of "aggrieved" under the KCPA:

This court has never been called upon to interpret the meaning of "aggrieved" in the context of the KCPA. Black's Law Dictionary  defines aggrieved as "[h]aving suffered loss or injury." Black's Law Dictionary 65 (6th ed. 1990).  In *Fairfax Drainage District v. City of Kansas City*, 190 Kan. 308, 374 P.2d 35 (1962), this court was called upon to determine the meaning of aggrieved in the context of G.S.1949,

14

12–502a, which authorized an appeal by the owner of land within the city limits "'who shall be aggrieved by the decision of the board of county commissioners.'" 190 Kan. at 314, 374 P.2d 35.  The district court held the drainage district was not an aggrieved party and, therefore, could not appeal from the order of the board of county commissioners.  In affirming the district court, this court quoted with approval from the district court's decision:

> "'A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected. (2 Am.Jur. 941, Appeal and Error, Secs. 149–152; Black's Law Dictionary, 3rd ed.)'" 190 Kan. at 314–15, 374 P.2d 35.

> In the present case, the students did not rely on the false statement, and many, if not all, of the students were unaware of the statement.  Many enrolled prior to the publication of the statement in the university catalogue.  Nor is there any showing that any of the students suffered injury or loss as a result of the publication of the statement.  The students enrolled and paid the tuition.  By so doing, they were consumers under the KCPA; however, the Act requires more in that they must also be aggrieved by the violation.

252 Kan. at 471-72.  The Court also acknowledged that its "statement in

*Manley [v. Wichita Business College],*237 Kan. [427] at 439, [701 P.2d 893

(1985)], that 'actual damages are not required in consumer protection cases'

was too broad."  252 Kan. at 472-73.  "A loss or injury resulting from a

violation of the Act is not required in an action filed by the attorney general

under K.S.A. 50-632 and K.S.A. 50-636; it is, however, required for one filed

by a consumer under K.S.A. 50-634(b)."  *Id.* at 473.  While an aggrieved

party under KCPA may not have to prove pecuniary damages, he or she still must prove an injury or loss resulting from the KCPA violation.  *Schneider*, 251 P.3d at 671; *see Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 823, 1 P.3d 899 (2000).

      The court is mindful that when the Kansas Supreme Court has not decided a question of Kansas law, it "must follow an intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise."  *Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1297 n.1 (10th Cir.) (quotation marks and internal citations omitted), *cert. denied*, 537 U.S. 814 (2002).  The court frankly is convinced from its plain reading of K.S.A. 50-634, as interpreted and applied by the Kansas Supreme Court in *Finstad*, that a consumer cannot successfully prosecute any private remedy action under the KCPA unless the violation has "aggrieved," *i.e.* resulted in an "injury or loss to" that consumer.  As defined in *Finstad*, "aggrieved" covers more than actual monetary damages and also means the invasion of a legal right, "denial of some personal or property right, or the imposition upon a party of some burden or obligation."  252 Kan. at 472. Thus, the *Campbell* decision is consonant with this plain reading of K.S.A. 50-634 and *Finstad* insofar as the accrual of a private KCPA action is not delayed until the consumer suffers or assesses the extent of actual monetary damages.   The limitation period for a private KCPA action commences when

16

the KCPA violation occurs and aggrieves the consumer.

The undisputed facts show the plaintiff was an aggrieved consumer no later than October of 2006. The affirmative misrepresentation claim is that the defendant would submit the plaintiff's hospital bills to his health insurance carrier, and the failure to disclose claim is that the defendants did not disclose their intent to pursue a hospital lien rather than submit a claim to the plaintiff's health insurance carrier. The plaintiff alleges the misrepresentation and omission occurred within the context of the consumer transaction of St. Luke's providing medical care and treatment to him in exchange for what the plaintiff expected to be payment from his health insurance carrier. As he has alleged and argued throughout this litigation, the plaintiff claims injury from the defendants' refusal to submit his medical bills to the plaintiff's health insurance carrier. Specifically, the plaintiff claims that the defendants' violations and refusal to submit his medical bills resulted in him losing the contractual benefit of coverage under his health insurance plan. Instead of having his bills paid under his health insurance, the plaintiff asserts liability for them devolved to him and/or attached to his asset, his right to recovery from a third-party tortfeasor.

By the weight of these allegations alone, the plaintiff meets the definition of an aggrieved consumer once he was denied the benefits of health insurance coverage. The losses or injuries attending this denial are of

17

a kind that could be addressed by various relief, including a civil penalty and injunctive relief, available under the KCPA.  It is undisputed that St. Luke's had 90 days from the end of the plaintiff's treatment to submit a claim to the plaintiff's health insurance carrier.  Consequently, 90 days after the last day of treatment, July 14, 2006, or October 12, 2006, was when the plaintiff's health insurance coverage was lost for any care and treatment rendered by St. Luke's that is the subject of this suit.[2]  The plaintiff Rinehart did not file his action within the subsequent three-year window.

      The court is not persuaded by the plaintiff's argument that his claim for class action relief entitles him to a delayed commencement of the limitation period.  The plaintiff's right to bring this private action under the KCPA accrued when the violation occurred that aggrieved him, that is, when the misrepresentation and/or omission resulted in his loss of coverage under his health insurance plan.  K.S.A. 50-634(a), (b).  "Under subsection (b), an aggrieved consumer may recover the greater of his actual damages or the civil penalties."  K.S.A. 50-634, Kansas Comment, 1973, ¶ 2.  In arguing for a delayed commencement based on the class action provision, the plaintiff essentially wants the benefit of a longer limitations period for his own damages claim by having also alleged a class action claim.  To grant an

---

[2]In an effort to distinguish *Campbell*, the plaintiff argues he made later requests (2008 and after) for St. Luke's to submit claims to his health insurance carrier, and St. Luke's refused.  The plaintiff fails to show how this can be considered as a claim here for continuing deceptive conduct.

18

extended limitation period for this elected claim of relief would create a situation not unlike that criticized by the Kansas Supreme Court in *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 823-824, 1 P.3d 899 (2000).  Because 50-634(b) "contemplates one action" and the recovery of "whichever is greater," penalty or damages, it "would frustrate the intent of the statute" to apply a different limitations period for an actual damages claim.  *Id.* at 824.  By the plain terms of K.S.A. 50-634(c), the plaintiff did not have to wait for the payment of the liens in November of 2009 to bring a class action claim for some or all the relief now sought.

The defendants are entitled to summary judgment on the plaintiff's KCPA claims.

<u>Tortious Interference with Contract</u>

On his behalf and for the class, the plaintiff alleges they enjoyed "a valid business relationship with their own health insurance providers by virtue of an express or implied contract" that they each had "with their health insurance carrier."  (Dk. 1, ¶ 46).  It is further alleged that St. Luke's acting with knowledge of these contracts "intentionally interfered and prevented Plaintiff and the Class from receiving the benefit of their contractual business relationship."  *Id.* at ¶ 48.  The "Plaintiff and the Class" allege that because of this intentional interference they "have suffered actual damages."  *Id.* at ¶ 49.

19

In his cross-motion for summary judgment on this tortious interference with contract claim, the plaintiff develops his damage theories as follows:

> [W]hen hospitals refuse to submit bills to their patients' insurers, patients incur two types of damages--wasted premiums and costlier health care.
>
> **1.  Wasted premiums**
>
> . . . .
>
> Compare the foregoing scenario to one in which the hospital opts to file a lien and does <u>not</u> submit a patient's bills to insurance:
>
>> Q.  What value did the patient get from his health insurance when you decided not to submit his bill to his health insurance?
>> A.  Well, he would--I don't know.
>> Q.  Did he get any value from it?
>> A.  On that individual specific account?
>> Q.  Yes.
>> A.  No.
>
> (<u>Id.</u> [Watkins Dep.] at 82:2-9).  In other words, when Defendants refuse to submit their patients' bills to insurance, Defendants deprive those patients of the contractual benefits for which they bargained. Patients such as Mr. Rinehart pay premiums for years with the expectation of receiving the very in-network benefits that Defendants readily admit they deny.
>
> **2.  Costlier health care**
>
> When Defendants elect to file hospital liens in lieu of submitting bills to insurance, patients have to pay considerably more for their health care.  Unlike with insurance, where the patient simply pays a co-pay to receive treatment, hospital liens typically seek to recover the entire cost of treatment from the patient's tort recovery.  Hospitals such as St. Luke's prefer to assert liens for that very reason.  Filing a lien allows the hospital to charge patients more and, more significantly to the hospital, to avoid being reimbursed at the discounted rate that they have negotiated with "in-network" insurers for which the insured pays a premium to receive. . . .
>
> . . . .
>
> In short, Defendant's billing practices were enacted with one goal in mind--to make as much money as possible, though doing so comes

20

at the expense of the patient who has wasted money on premiums for which he received no health care coverage and in fact paid more for costlier health care than his existing contract would have allowed.

(Dk. 32, pp. 13-16).  As fully articulated above, the plaintiff alleges actual damages of two kinds:  (1)  wasted health insurance premiums and the loss of the contractual benefits of insurance coverage; and (2) increased health care costs as measured by the additional monies the hospital collects through its liens.

A claim for tortious interference with contract in Kansas is subject to the two-year statute of limitations at K.S.A. 60-513(a)(4).  *Bradbury Co., Inc. v. Teissier-duCros*, 413 F. Supp. 2d 1203, 1206 (D. Kan. 2006).  The accrual date for this cause of action is also governed by K.S.A. 60-513:

(b)  Except as provided in subsections (c) the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonable ascertainable to the injured party.

K.S.A. 60-513(b); *see id*. at 1207.  "'[S]ubstantial injury' means an injury for which a legal action lies," that is, an actionable injury.  *Moss v. Mamalis*, 36 Kan. App. 2d 151, 155, 138 P.3d 380 (2006) (citations omitted).  A "'substantial injury' . . . does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations.  Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent." *Moon v. City of*

21

*Lawrence*, 267 Kan. 720, 727-28, 982 P.2d 388 (1999) (quoting *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984)).  "It is knowledge of the fact of an actionable injury, not the extent, which triggers the statute of limitations." *Moss v. Mamalis*, 36 Kan. App. 2d at 155 (citations omitted). In that regards, "[t]he term 'reasonably ascertainable' does not mean 'actual knowledge' but is 'an objective standard based on an examination of the surrounding circumstances.'" *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 921 (10th Cir.2005) (citations omitted).

To prevail on their motion for summary judgment, St. Luke's "must show, as a matter of law, that there is an absence of evidence to support the plaintiff's claim that the fact of injury from the alleged tortious interference could not reasonably be ascertained by plaintiff more than two years" before April 19, 2010, when the plaintiff filed this action.  *Bradbury Co., Inc. v. Teissier-duCros*, 413 F. Supp. 2d at 1207 (citation omitted). Based on the plaintiff's claim that he was injured when he was denied the benefit of his bargain under his health insurance contract, the defendants argue the plaintiff's claim accrued when St. Luke's did not submit the plaintiff's medical bills to his health insurance carrier and instead filed hospital liens.  "Once Defendants had executed the lien and their deadline for filing a claim with United Healthcare had passed, then Plaintiff could have filed a tortious interference claim, alleging that Plaintiff had lost the benefit of

his bargain." (Dk. 34, p. 16). St. Luke's dates these events as reasonably ascertainable in October 2006 (notice of a hospital lien had been given and the 90-day period for St. Luke's to file claims with United Healthcare had expired) and, on any arguable standard of reasonably ascertainable, as no later than October 2007 (Rinehart has testified that based on a collection agency letter received then it did "sink in" to him that Saint Luke's would not be filing any claims with his health insurance carrier).

The plaintiff posits the argument that interference with the contract itself is not an actionable injury but that the plaintiff "must be damaged beyond the fact of the interference itself" citing *Cramer v. Stonebridge Inn, Inc.*, 713 P.2d 645, 647 (Or. App. 1986). The plaintiff insists his "cause of action did not accrue until the liens were both filed (interference) *and* he was forced to pay money out of his tort recovery (damage)." (Dk. 38, pp. 16-17). The plaintiff says it does not matter when he realized the hospital was resorting to liens, for "he did not sustain actionable injury until he lost money." *Id.* at 17. The plaintiff then ponders what damages he could have recovered if there had been no recovery against the original tortfeasor. The plaintiff's memorandum offers no explanation for the glaring contradiction between it and his filed motion for summary judgment in which he asserts and seeks damages for "wasted premiums" and for the defendants' "depriv[ing] those patients of the contractual benefits for

23

which they bargained [under their health insurance]."  (Dk. 32, pp. 13-14).

Nonetheless, the plaintiff believes that because his claim was filed within the

two-year period after the pay off of the hospital liens, his claim is timely.

In reply, the defendants recognize the inherent problem with the

plaintiff now narrowly characterizing his remedies to defend against this

motion:

> It is true that Plaintiff may not have had to pay anything to Defendants
> pursuant to the liens if Plaintiff did not obtain a tort recovery.  But
> Plaintiff still would have lost the benefit of his health insurance, and he
> knew it by October of 2007.  One category of damages he no doubt
> would seek is money paid to Defendants out of his tort recovery.  That
> did not occur until 2009.  But presumably he also could have sought
> any other economic damages, if any, that flowed from the loss of his
> health insurance.  These damages would have occurred by no later
> than October 2006 (when his claim was not submitted to health
> insurance); Plaintiff was aware of them by October 2007.  Apparently,
> Plaintiff concedes that damages are limited only to the actual amounts
> paid to Defendants, and that he and the class are only able to seek the
> actual amounts paid.  No other economic harm or actual loss occurred.
> Thus, if the Court accepts Plaintiff's argument that he was not damaged
> until he made the $3,500 payment, then the Court should limit
> Plaintiff's potential damages to only that amount.  Or, if the Court
> concludes that Plaintiff had suffered damage before Plaintiff paid
> $3,500 to extinguish Defendants' lien on his third-party tort recovery,
> then the Court should hold that the two-year statute of limitations bars
> the tortious interference claim.

(Dk. 40, p. 10).  This case does not present the option of binding the plaintiff

to a damage claim equal to only the lien pay off.  As already summarized

above from the plaintiff's own motion for summary judgment, the plaintiff is

seeking also economic damages flowing from the loss of the benefit of the

bargain under his health insurance.  (Dk. 32, pp. 13-14).  The logical flaw in

24

the plaintiff's defense to this motion is that he alleges the wrongful act of interference is the hospital's refusal to submit the claims but for purposes of this motion then ignores what claimed damages flow from that act and focuses exclusively on the damages that flow from the hospital's collection of the liens.

A claim for tortious interference with contract generally can be brought against a person "who, without justification, induces or causes, a breach of contract will be answerable for any damages caused thereby." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).  "The elements essential to recovery for tortious interference with a contract are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom."  *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003) (quotation marks and citations omitted).

"Ordinarily, a cause of action accrues at the time of the act giving rise to the alleged injury or damage.  If the injury is not simultaneous with the act, it accrues at the time the injury becomes reasonably ascertainable." *See v. Hartley*, 257 Kan. 813, 820, 896 P.2d 1049 (1995).  Generally, the statute of limitations commences "as soon as the right to maintain a legal action arises, . . . [that] point in time the plaintiff could first have filed and prosecuted his action to a successful conclusion."  *Johnston v. Farmers*

25

*Alliance Mutual Ins. Co.*, 218 Kan. 543, 548, 545 P.2d 312 (1976).  In

*Johnston*, the plaintiff's tort claims included tortious interference with an

employment contract resulting in the loss of employment.  The Kansas

Supreme Court found:

> According to plaintiff's deposition he was called into Mr. Skupa's
> office on March 3, 1972, and terminated.  Although plaintiff drew his
> pay by check until May 31, 1972, he did not work for and was not
> associated with Alliance after March 3, and was in fact employed by
> another company on May 25, 1972.  By his own testimony plaintiff
> knew he was being terminated by Alliance on March 3, 1972. . . .
> Obviously, substantial damages for mental suffering and damage to
> reputation were caused and began to accrue upon plaintiff's receipt of
> notice that he was being terminated.  Any punitive or exemplary
> damages would have accrued upon notice of termination and would
> have been recoverable during this extended leave of absence.  The acts
> causing plaintiff's injury occurred on or before March 3, 1972, and any
> cause of action plaintiff had against Alliance or Skupa could have been
> brought after that date.

218 Kan. at 548.  In short, the court found the limitations period for the tort

claim commenced with notice of termination and the accrual of some damage

elements, even though the actual loss of wages occurred later.

*Johnson* was recently applied in a case where the plaintiff, an

independent marketing organization, sued the defendants for tortious

interference with the plaintiff's contract to perform distribution and marketing

functions for the insurance company, Aviva USA.  *Vazirani & Associates*

*Financial, LLC v. Heitz*, 2011 WL 2295027 (D. Kan. 2011).  The court held:

> Aviva notified plaintiff of the termination of their contractual
> relationship, as well as the termination of all contracts with downline
> agents, during the November 6, 2008 call.  Although the injury did not

occur until the termination became effective on January 30, 2009, the injury was reasonably ascertainable to plaintiff in November because the damages associated with the contract terminations were known at that time.  The statute began to run as soon as plaintiff received notice of termination and could maintain a legal action, not when the termination became effective.  Because this action was filed on January 29, 2011 and the two year statute of limitations ended on November 6, 2010, plaintiff's claim of tortious interference is time-barred.  Therefore, defendant's motion to dismiss plaintiff's claim of tortious interference is granted.

2011 WL 2295027 at *3.  As evident in *Johnson* and *Vazirani*, Kansas law recognizes that a claim for tortious interference with contract accrues when the injury is reasonably ascertainable though the full actual loss may not happen until later.  *See also*, *Bradbury*, 413 F. Supp. 2d at 1207-08 (claim for tortious interference with a no-competition covenant accrued with knowledge the covenants had been breached); *Phillips USA, Inc. v. Allflex USA, Inc.*, 869 F. Supp.  842, 851 (D. Kan. 1994) (injuries from breach of contract were reasonably ascertainable as was the interference with contract so that the tort action accrued at the same time as the breach of contract action), *aff'd*, 77 F.3d 493, 1996 WL 80448 (10th Cir. 1996).  The weight of these Kansas authorities convinces the court that the plaintiff had experienced a substantial or actionable injury when the defendant's failure to submit claims deprived him of the "contractual benefits" of his health insurance and resulted in "wasted premiums."  (Dk. 32, pp. 13-14).

The plaintiff cites several cases involving liens and statute of limitations issues.  None of them offer any persuasive principles applicable to

27

the question here.  In *Cramer*, the Oregon Court of Appeals found that the plaintiffs had not been damaged beyond the fact of the interference itself when the defendants' actions caused "the subordination of plaintiffs' lien." 713 P.2d at 647.  "[T]hey had no actionable claim until that subordination made their lien valueless, *i.e.,* when the foreclosure sale failed to provide funds to pay off their note." *Id.*  In *In re Gainier*, 2010 WL 1780356 at *2 (Bankr. D. Id. May 3, 2010), a bankruptcy court found that a professional liability claim against a notary public for notarizing a forged signature on a deed of trust did not accrue until the property was sold and proceeds paid to release the lien associated with the deed of trust.  Finally, in *Baylor University Medical Center v. Borders*, 581 S.W.2d 731, 733 (Tex Civ. App. 1979), the court found that the hospital's "action against those who pay or receive funds in derogation of a hospital lien . . . does not accrue until judgment or settlement proceeds are actually paid."  Unlike *Cramer* where the subordination of the lien caused no damages, Rinehart lost the benefit of his contractual bargain when the defendants failed to submit claims to his health insurer.  Unlike *Gainier* where the claim is for damages flowing from professional misconduct, Rinehart is claiming damages that flow from being deprived his health insurance benefits.  Unlike *Borders* where no wrongful act occurs until proceeds are paid in derogation of the lien, Rinehart is claiming the defendants wrongfully interfered with his hospital insurance by not

28

submitting his claims.  Thus, Rinehart suffered actionable injury before the defendants ever collected on their hospital liens.

The plaintiff concedes this is not a case of "delayed discovery" but a question of when an actionable injury occurred.  For all the reasons stated above, the court finds that as a matter of law the plaintiff sustained an actionable injury when the plaintiff lost the benefit of his health insurer paying these claims.  This occurred no later than October of 2006.  The fact of this injury became reasonably ascertainable to the plaintiff no later than October of 2007 as fully evidenced by his deposition testimony.  As he explains in his deposition testimony, the plaintiff realized as of October of 2007 that St. Luke's was not filing claims with his health insurance, was pursuing instead hospital liens, and "was coming after me [him] personally for this." (Dk. 34, Att. A, Rinehart Dep. p. 40).  The plaintiff admitted "it really started to sink in" that he could no longer expect his health insurance benefits to take care of these bills.  *Id*.  Having waited more than two years after this to file this action, the plaintiff's tortious interference with contract claim is barred.

IT IS THEREFORE ORDERED that the defendants Saint Luke's motion for summary judgment (Dk. 33) on statute of limitations grounds is granted;

IT IS FURTHER ORDERED that plaintiff's motion for summary

judgment on his claim for tortious interference with contract (Dk. 32) is denied as moot.

Dated this 3rd day of August, 2011, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge